In re WORCESTER QUALITY
FOODS, INC., Debtor.

David M. NICKLESS, Trustee, Plaintiff,

v.

EQUIPMENTLEASE CORPORATION,
Marine Midland Business Loans,
Inc., Erle Martin, Defendants.

Bankruptcy No. 90–42013–JFQ.
Adv. No. 91–4121.

United States Bankruptcy Court,
D. Massachusetts.

May 7, 1992.

David Nickless, Nickless and Phillips, Fitchburg, Mass., trustee.

Carl Aframe, Worcester, Mass., for Equipmentlease Corp., defendant.

Mary Anne B. Tillona, Murtha, Cullina, Richter and Pinney, Hartford, Conn., for Erle Martin, III, defendant.

Stephanie Kahn, Hoberman & Pollack, P.C., Boston, Mass., for Marine Midland Business Loans, Inc.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

Cross motions for summary judgment present a three-cornered dispute over the remaining proceeds from the sale of an airplane. At the heart of the controversy is the perennial issue of whether a transaction constitutes a lease or a security agreement, but with a new twist. The question is relevant not with respect to the necessity of a filing by the named lessor but rather with respect to its substantive rights under the agreement. Claiming entitlement to the proceeds are the trustee in bankruptcy, David M. Nickless (the "Trustee"), a lessor of the plane, Equipmentlease Corporation ("EQL"), and a secured lender, Marine Midland Business Loans, Inc. ("Marine"). The Trustee has settled with the Defendant Erle Martin ("Martin") since the filing of the complaint.

## I. FACTS

The facts are uncontested. In January of 1989, Worcester Quality Foods, Inc. (the "Debtor") entered into a $12,000,000 line of credit with Marine. It granted Marine a security interest in "all accounts, chattel paper, general intangibles, documents, inventory, machinery, equipment and other goods ... now owned or hereafter acquired or arising." Marine perfected its security interest by filing under the Uniform Commercial Code.

On March 10, 1989, the Debtor entered into an agreement (the "Agreement") with EQL for the lease of a Beechcraft Model E 90 Aircraft. The Debtor had previously arranged for EQL's contemporaneous purchase of the plane for $450,000 from Trans–Continental Aviation, Inc. The lease was for five years at a monthly rental equal to decreasing percentages of $450,000 ranging from 2.865% in the early months to 1.986% in the final months.

Article XVIII of the Agreement gave the Debtor the option to purchase the plane "for cash equal to its then Fair Market Value (plus all applicable sales taxes, see Annex G)." Annex G provides as follows:

> If lessee elects to purchase or sale is made to a purchaser directed by lessee or sale is made to highest bidder except, in case of a Default, if the Net Sales Proceeds should exceed the Stipulated Loss and Termination Value lessor will refund, as an adjustment of lease charges, that portion which equals the excess to the lessee."

The "Stipulated Loss and Termination Value" is set forth in the Agreement as a varying value which gradually decreases over the life of the Agreement, beginning at $442,500 on March 31, 1989 and ending at zero on February 28, 1994. In effect, therefore, the Debtor had the right to purchase the plane for nothing at the end of the Agreement's term.

The reference in Annex G to a sale to a third party has to do with the early termination rights of the Debtor set forth in Article XVII of the Agreement. Article

XVII gives the Debtor the right to terminate the Agreement "so long as no default exists hereunder," solicit cash bids from others and pay EQL the current termination value prior to sale to the third party. Article XVII then states: "Provided that all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Aircraft ... for cash to the highest bidder; and (ii) refund the proceeds of such sale ... to Lessee up to the amount of the Termination Value paid by lessee." Presumably under this language, if the sales proceeds exceed the termination value, EQL may retain the excess so that the Debtor in the final analysis pays nothing. This, however, is inconsistent with Annex G quoted in full above which covers a sale to a third party as well as purchase by the Debtor. Under Annex G, EQL retains that portion of the third party sales price equal to the current termination value and the Debtor gets only any excess. Annex G was separately initialed by the parties.

On June 23, 1989, EQL recorded the Agreement with the Federal Aviation Administration in Oklahoma City, Oklahoma. This included the recording of Annex C to the Agreement which consists of a document signed by the prior owner, Trans–Continental Aviation, Inc., consenting to the passing of "[t]itle and risk of loss of the Aircraft" to EQL.

On November 12, 1990, the Debtor hired Martin, an airplane broker, to sell the plane. On November 15, 1990, three creditors filed a petition against the Debtor requesting relief under chapter 7. Shortly thereafter, the Debtor obtained an order for relief under chapter 11 and the Trustee was appointed to serve as a chapter 11 trustee. He has continued to serve as trustee since conversion of the case to chapter 7.

In late December of 1990, apparently through the efforts of Martin, Northern Jet, Inc. made an offer to purchase the plane for $400,000. The Trustee, without hiring Martin, sought court approval for the sale. On January 29, 1991, he filed a notice of intended sale. In accordance with court procedure, Greater Media Cable, Inc.

offered to purchase at $420,001.50 and in March of 1991, I authorized a sale to it. EQL thereafter executed a bill of sale to Greater Media Cable, Inc. upon being paid $327,650.35, which represented the current termination value under the Agreement plus overdue payments. Upon EQL's subsequent motion under section 506(b) for various expenses, I authorized an additional payment to EQL of $15,539.35.

EQL cooperated in this entire process. It arranged for moving the plane from New York to Worcester, ordered a survey of the plane to determine its air worthiness, and assisted the Trustee in the preparation of court documents. It nevertheless sought to preserve whatever rights it had to the surplus sales proceeds. On March 11, 1991, EQL's counsel wrote to the Trustee stating: "We have both agreed that the payment by the Trustee of the stipulated loss and termination value and the outstanding accounts receivable for unpaid lease payments shall not be a waiver of either party's claim to expenses and the surplus of the sale." The letter also stated: "Your section 506(c) expenses are to be paid ahead of our ... section 506(b) expenses."

## II. LEASE OR SECURITY AGREEMENT?

Article XVIII purports to give the Debtor the option to purchase the plane at fair market value. But its words "see Annex G" and the provisions of Annex G tell another story. Upon the Debtor's exercise of the option at the end of the five years, when the termination value is zero, EQL is required to return the entire purchase price to the Debtor, in effect giving the Debtor an option to purchase for nothing.

 Under section 1–201(37) of the Uniform Commercial Code the presence of such an option is sufficient of itself to create a security interest. The U.C.C. does not apply, however, to any security interest which is subject to a federal statute governing the rights of the parties. MASS.ANN. LAWS L. ch. 106, § 9–104(a) (Law.Co-op. 1984). There are federal statutes governing the rights of parties claiming a security

interest in aircraft. *See* 49 U.S.C.App. §§ 1401–1406 (1988). A conditional sale of an airplane, which is a form of security agreement, includes "any contract for the ... leasing of an aircraft ... by which the ... lessee contracts to pay as compensation a sum substantially equivalent to the value thereof, and by which it is agreed that the ... lessee is bound to become, or has the option of becoming, the owner thereof upon full compliance with the terms of the contract." 49 U.S.C.App. § 1301(19) (1988). The Debtor's option to purchase the plane for nothing after having paid in "rental" payments a total sum substantially equal to the plane's value makes the Agreement a security agreement. This is confirmed by regulations promulgated by the FAA. *See* FAA Examination Guidelines, Chapter 2, Section 2.2.5(d).

## III. TRUSTEE VS EQL

■ The Trustee is entitled to prevail over EQL for two reasons. The first and most basic stems from the presence of EQL's security interest and the Trustee's corresponding ownership interest. The security interest secured payment of the current stipulated loss and termination value. That sum, plus EQL's back "rent" and expenses, has been paid in full. The secured debt having been discharged, EQL's rights in the plane or its sales proceeds have terminated. EQL's insistence that the Trustee has no rights under Article XVII on early termination is therefore misplaced. The Trustee's rights are those of a debtor whose secured debt has been paid in full.

■ Second, the Debtor's early termination rights under Annex G entitle the Trustee to prevail over EQL even if the Agreement is considered a true lease and not a security agreement. Under Annex G, the Debtor has the right to any excess of sales proceeds over the current termination value. That provision, separately initialed by the parties, is controlling over the confusing and somewhat contradictory language of Article XVII.

EQL points to the provisions of Article XIII entitled "REMEDIES." Article XIII(a) gives EQL various rights upon default, including the right to demand payment of the stipulated loss value, terminate the Agreement, obtain possession of the plane and sell it at public or private sale. EQL places particular reliance upon Article XIII(c) which gives EQL the right to retain any surplus proceeds of the sale. But Article XIII(a) pertains to a repossession and sale by EQL. That did not occur here.

■ It is nevertheless true that Annex G gives the Debtor the right to have the plane sold and retain the surplus sales proceeds only if the Debtor is not in default. Although admitting that the Debtor made all payments due through October of 1990, EQL asserts, and it is not denied, that these payments were continuously late, and the payments due after the bankruptcy filing were not made until sale of the planes. And EQL asserts a further default in the lapse of insurance coverage during a short period postpetition. None of this avails EQL even if the Agreement is a true lease. Viewing the Agreement as an unexpired lease, the Trustee had the right to assume it and to cure any default thereunder. 11 U.S.C. § 365 (1988 & Supp.1990). The Trustee's court-authorized sale of the plane and payment of back rent to EQL must be considered an assumption of the lease, including the lessee's early termination rights, and a cure of all defaults.

## IV. TRUSTEE VS. MARINE

Exposition of the Trustee's superior rights over Marine need not detain us long. Marine argues that the Trustee's right to receive the surplus proceeds constitute "general intangibles" which are subject to Marine's security interest. This argument of course founders upon my conclusion that the Trustee's rights are those of the owner of a plane. Marine concedes that a security interest in the plane must be perfected by filing with the Federal Aviation Administration in Oklahoma City. 14 C.F.R. § 49.11 (1991). Marine made no such filing.

■ Marine says, however, that the Debtor's failure to register the airplane in

its name rather than that of EQL misled Marine and other creditors so that the Trustee should be estopped from claiming ownership in the bankruptcy estate. This is an argument born of desperation. An owner's failure to register his ownership with the FAA does not exonerate a secured party from failing to record its security interest in the plane. *Comair, Inc. v. Air Vermont, Inc. (In re Air Vermont, Inc.),* 45 B.R. 820 (D.Vermont 1984). The Debtor, moreover, took no action inconsistent with the Trustee's position that the Agreement is a security interest. The terms of the Agreement itself establish the presence of a security agreement. And no creditor could be misled because the Agreement was on public file with the FAA. In any event, the Trustee should not be estopped by any action of the Debtor.

A separate judgment has issued declaring that the Trustee is entitled to the surplus sales proceeds.